IAN WALLACH (SBN 237849)
LAW OFFICE OF IAN WALLACH, PC
5777 WEST CENTURY BLVD., SUITE 750
LOS ANGELES, CA 90045
T: 213.375.0000; F. 213.402.5516
iwallach@wallachlegal.com

*Attorney for Defendant*,
Mason Edward Heintz

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>HAVILAND, *ET AL.* (MASON HEINTZ),<br><br>Defendant | Case No.: 2:24-cr-00570-57-WLH<br><br>SENTENCING POSITION PAPER OF DEFENDANT MASON EDWARD HEINTZ<br><br>Hearing Date: April 17, 2026<br>Time: 11:30 A.M.<br><br>*Before the Hon. Wesley L. Hsu* |

## I. INTRODUCTION

Defendant Mason Edward Heintz ("Mr. Heintz") submits his Sentencing Position Paper.

Rarely does the Court encounter a defendant who has achieved such sustained and verifiable rehabilitation prior to sentencing. Following a troubling childhood, Mr. Heintz began a battle with alcohol when he was only 13 years old (Presentence Investigation Report ("PSR") [ECF 1997], ¶¶ 175 – 76). He

succumbed at the age of 17 to daily cocaine use along with other drugs. (PSR, ¶ 176). At the age of 20 he began his 12-year addiction to methamphetamine which he used daily and almost cost him his life on several occasions. (PSR, ¶¶ 177, 179-80). He had two-year addiction to heroin which he also used daily. (PSR, ¶ 178). And then became addicted to fentanyl -- leading to his offense. (PSR, ¶¶ 179-80). And during all of this time, he engaged in criminal activity typically associated with those addicted to methamphetamine – acquisitive and drug possession crimes. (PSR, ¶¶ 136-48).

Being arrested in 2024, and being incarcerated until the middle of 2025, was among the best things that ever happened to Mr. Heintz. He finally got clean.

Things changed even more substantially when, on May 6, 2025, the Honorable Magistrate Jacqueline Chooljian took a chance on him, and despite his history, granted bail so he could attend a rehabilitation program at the Salvation Army. (Minutes Of Review /Reconsideration Of Bail /Detention Order -Bond Hearing dated May 6, 2025 [ECF 1156]. And there he thrived.

Standing before this Court is a full-time student who just completed his first term of college with a 4.0 GPA and has had perfect compliance on pre-trial supervision (never once testing positive for drugs). Those who meet him are incredibly impressed with his recovery (as evidenced by the PSR).

The defense appreciates the recommendation of the Department of Probation and Pre-Trial Services ("USPO") of a sentence of one year and a day. Yet in light of Mr. Heintz' outstanding rehabilitation and the fact that he has already served over six months in custody (190 days -- October 28, 2024 to May 6, 2025), Mr. Heintz requests a sentence of six-months of incarceration (time served) plus three years of supervised release. And if that the Court deems additional custodial time

to be necessary, he requests that such time consists of six months to be spent on home detention.[1]

Mr. Heintz' guideline range of 8, with his criminal history category of VI, is only 2 levels above that which would make him eligible for a split sentence. U.S.S.G. § 5(a). A sentence of one year and a day for a U.S. citizen usually translates to approximately 10 months and a 10 – 12 days, which is only 4 months longer than the time he has already served. It is a sentence that would allow him to stay in college, secure employment and continue the road to success that he has firmly established. Such a downward variance is warranted here, due to:

- his outstanding rehabilitation;
- the fact that his Criminal History overstates his dangerousness and clearly stems from the drug addictions he has overcome (Mr. Heintz has 2+ years of sobriety);
- his recent academic success, which is admirable in light of his extremely troubling childhood; and
- his minimal involvement.

In light of the above, a sentence time served (6 months and 10 days) is sufficient, but not greater than necessary, to satisfy the purposes enumerated in Section 3553(a).

---

6 F

[1] The undersigned counsel has conferred with the Salvation Army Rehabilitation Center on March 27, 2026 and confirmed that if Mr. Heintz is subject to home detention he may still reside there until his program is deemed complete. Afterwards, Mr. Heintz will be able to reside with his mother and brother.

## II. FACTUAL BASIS

The factual basis contained in the Plea Agreement is narrowly tailored to specifically address the conduct the parties believe the government would be able to prove at trial. Namely, that on many occasions Mr. Heintz bought drugs for him and his then-girlfriend, both drug addicts, to share, but not to sell.

Specifically, the factual basis provides as follows in relevant part (*emphasis added*):

> Beginning on a date unknown and continuing through in or around September 2024, defendant Heintz agreed with a co-conspirator to distribute and possess with the intent to distribute fentanyl. Defendant Heintz joined the agreement knowing of its purpose and intending to help accomplish that purpose. *Specifically, defendant Heintz would obtain fentanyl from the co-conspirator and then distribute it to a third party*. Defendant admits that, as part of the conspiracy, he and his co-conspirator agreed to distribute and possess with intent to distribute a mixture or substance containing a detectable amount of fentanyl.

By design, the factual basis does not say "third *parties*", but rather identifies what the evidence showed – that he and a third ***party*** (his ex-girlfriend) shared the drugs he purchased.

This is consistent with the findings by the United States Department of Probation and Pre-Trial Services (Addendum To The Presentence Report filed March 24, 2026 [ECF 1998], pp. 1-2) which resulted from a detailed review of available evidence presented in Defendant's Objections to the PSR filed on March 4, 2026.

This distinction is significant — it places Mr. Heintz's conduct closer to shared personal use than distribution in the conventional commercial sense.

## III. OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT

Mr. Heintz accepts the Amended Pre-Sentence Investigation Report dated March 24, 2026 [ECF 1997] ("PSR") as accurate.

## IV. CRIMINAL HISTORY

In *United States v. Reyes*, 8 F.3d 1379, 1383 (9th Cir. 1993) the Court stated that "there may be cases where the court concludes that a defendant's criminal history category significantly over-represents the seriousness of a defendant's criminal history . . . . The court may conclude that the defendant's criminal history was significantly less serious than that of most defendants in the same criminal history category . . . and therefore consider a downward departure from the guidelines". A departure as to his Criminal History Category is warranted here.

Mr. Heintz does not dispute that his criminal history is serious – it is. But his criminal history lacks violent crimes or crimes that yield financial gain. His past conduct is materially different from that of most defendants who have the same Criminal History Category. His crimes were acquisitive, non-violent, low-yielding and consistent with the conduct of one impaired by a meth addiction.

Newly-emerging research establishes the link between extensive methamphetamine use and property and fraud crimes[2] – exactly the criminal

---

[2] *See* R. McKetin, J. Boden, *et al.* "The contribution of methamphetamine use to crime: Evidence from Australian longitudinal data, Drug and Alcohol Dependence, Volume 216, 2020" (https://doi.org/10.1016/j.drugalcdep.2020.108262) (last accessed Mar. 25, 2026) (providing robust evidence that methamphetamine use is associated with a large increase in the likelihood of crime, with participants five times more likely to report crime during periods of use); Goldsmid S & Willis M 2016., "Methamphetamine use and acquisitive

conduct that Mr. Hines engaged in during meth addiction. While this does not excuse Mr. Heintz' past conduct, it is a strong indicator that his current established sobriety greatly reduces any societal risk that he may pose.

## V. MR. HEINTZ' MINIMAL INVOLVEMENT IN THE CONSPIRACY

Mr. Heintz is here because he bought drugs for him and his girlfriend to share. And times, his ex-girlfriend would use his cellphone to purchase more. In other jurisdictions, this act would not constitute a violation of 21 U.S.C. §§ 846, 841 (a) (1). *See United States v. Swiderski*, 548 F.2d 445, 452 (2d Cir. 1977)[3]. But Mr. Heintz concedes that in this Circuit it does. *See United States v. Wright*, 593 F.2d 105, 108 (9th Cir. 1979).[4] But the minimal nature of his conduct — as

---

crime: Evidence of a relationship". Trends & issues in crime and criminal justice no. 516. Canberra: Australian Institute of Criminology. https://doi.org/10.52922/ti149987 (last accessed March 25, 2026) (finding that meth and heroin uses are, respectively, 4.5 and 4 times more likely to commit acquisitive crimes than non-users); M. Gizzi & P. Gerkin, Methamphetamine Use and Criminal Behavior, 54 Int'l J. Offender Therapy & Comp. Criminology 915 (2010) (meth users far more likely than users of other drugs to commit property crimes); Northwest High Intensity Drug Trafficking Area, Methamphetamine and Related Crime: The Impacts of Methamphetamine Abuse 12 (Mar. 2006).

[3] Stating "[h]owever, the judge's repeated instruction to the effect that an intent to distribute could be inferred from the mere giving of the drug 'to a friend of yours or even to your fiancée' was error, which cannot be labelled harmless, since the jury's request indicated that its verdict might well turn on whether the passing of some or all of the drugs between the two appellants would constitute a distribution in violation of the Act. Furthermore, the Assistant United States Attorney had argued in summation that such a passing would suffice."

[4] In *Wright*, one party purchased drugs for two people (as is the case here) and the Court distinguished such conduct from that where two people purchased drugs together, stating:

compared to that of a customary defendant charged with 21 U.S.C. § 841(a)(1) — warrants consideration and supports a downward variance. He bought drugs to share with his then-girlfriend, also a drug addict (and a codefendant in this matter).

Furthermore, the amounts her purchased were drastically less than a customary § 841(a)(1) defendant does and is not within the core conduct targeted by the statute. Per the Indictment and the PSR, Mr. Heintz ordered an unknown quantity of fentanyl and methamphetamine on November 6, 2023. (PSR, ¶ 100). He purchased $180 worth of fentanyl on November 12, 2023. (PSR, ¶¶ 101-02). On November 7, 2023 he purchased $300 worth of fentanyl. On December 2, 2023, he ordered an ounce of fentanyl (PSR, ¶ 106) which, in 2023 could cost in the area of $650 to $1000 or even much less.[5] And he admitted to distributing and possessing with intent to distribute 2.49 *grams* of fentanyl.[6]

---

> Congress in 21 U.S.C. § 841(a)(1) demonstrated its intention to deter individuals from involvement or assistance in drug trafficking. Wright facilitated the transfer of the narcotic; he did not simply "simultaneously and jointly acquire possession of a drug for their (his and another's) own use."

Accordingly, within this circuit, Mr. Heintz' conduct amounts to a violation of 21 U.S.C. § 841(a)(1).

[5] (*See* Sjostedt, David, "Why is fentanyl drastically cheaper in San Francisco than in LA, NYC and Philly?" The San Francisco Standard, Jan. 22, 2024 (stating "In Los Angeles, a hub for drug trafficking organizations due to its proximity to the Mexican border, fentanyl dealers seek between $650 and $1,000 for an ounce of the drug, which is then usually broken down into smaller amounts for sale on the street"). And Mr. Heintz recalls that he paid $300 for the ounce which is similar to skid row prices in San Francisco. (*See id.*)

[6] This amounts to 6.25% of that required to trigger the five-year mandatory minimum sentence for fentanyl possession with intent to distribute. 21 U.S.C. § 841(b)(1)(B)(vi).

In total, the evidence established that Mr. Heintz purchased approximately $480 worth of fentanyl, placed additional small-scale orders, and possessed less than three grams at the time of his arrest. Even the largest alleged quantity—an ounce—falls below the 40-gram threshold that triggers a five-year mandatory minimum under 21 U.S.C. § 841(b)(1)(B), a benchmark reflecting Congress's judgment as to serious trafficking conduct. These quantities are materially lower than those typically involved in federal trafficking prosecutions.

This information is not offered to minimize Mr. Heintz's culpability, which he has accepted. Rather, it demonstrates that his conduct is far more consistent with that of a drug-dependent user than a conventional distributor, supporting a downward variance.

Similar facts were addressed in *United States v. Hubel*, 625 F.Supp.2d 845 (D.Neb. 2008). The defendant in *Hubel* had a guidelines range commencing of 37 to 46 months – approximately twice that of Mr. Heintz' guidelines range of 18 to 24 months. (PSR at p. 3). In *Hubel*, the amount of drugs (methamphetamine) at issue were 50 grams or more (*id.* at 846), more than at issue here, and the defendant in *Hubel* sold drugs to a co-defendant (there is no indication that the two had a special relationship as did Mr. Heintz and his then-girlfriend). Moreover, that co-defendant identified the defendant as his supplier. *Id.* at 847. The defendant's involvement in the conspiracy in *Hubel* was only for one month (and per the indictment, Mr. Heintz' involvement was slightly less – with his conduct occurring from November 6, 2023 through December 2, 2023. (Indictment [ECF 1] at pp. 118, 120, 125, 128 (overt acts nos: 598, 607, 611, 612, 647 – 48, 661)). Like Mr. Heintz, the defendant completed a substantial drug treatment program with

success. *Id.* And the defendant in *Hubel* also experienced a challenging upbringing and fell to drug addiction, as did Mr. Heintz. *Id.* at 852.

The *Hubel* court departed downward based on both the 3553(a) factors and U.S.S.G. § 5K2.0 and issued a sentence of time served plus five years of supervised release, justifying the sentence as follows:

> The fact of her arrest and incarceration will deter others from engaging in similar conduct. The deterrent effect of any further incarceration would be of marginal value. Because Ms. Hubel appears to appreciate the gravity of her offense, has made substantial gains in overcoming her addition, has refrained from using drugs or alcohol, and has participated in counseling and mental health treatment, there does not appear to be a great need to protect the public from Hubel's further crimes. The court's imposition of a five-year period of supervised release that includes stringent conditions of supervision, continued participation in her drug-abuse program and random drug tests, ensures Hubel's adherence to a law-abiding lifestyle. Moreover, the court has the authority to incarcerate Hubel in the future should she fail to comply with the terms of supervised release.

*Id*. at 852-53. The analysis in *Hubel* is compelling and supports Mr. Heintz' request for a time-served sentence.

## VI. MR. HEINTZ' HISTORY AND BACKGROUND

The following information is derived from the PSR interviews with Mr. Heintz, his mother Mireille Heintz, his brother Brian Heintz, his family friend Thomas Hunt, and his girlfriend, Stephanie Negrete, as well as a review of available records.

a. Early Life

Mr. Heintz is the youngest of two children resulting from the marriage of Paul Heintz and Mireille Jacob. (PSR, § 156). His parents met at a marathon race in London, England around 1986. Paul Heintz traveled to France several times to visit Mireille Heintz and eventually married in July of 1988. Mother became a lawful permanent resident in 1989 and moved to live with Paul Heintz in Canyon County.

The couple's first child was Mr. Heintz' older brother Brian Heintz, who was born in 1986. Unfortunately, due to a problem during his childbirth (strangulation by the umbilical cord), Brian Heintz suffers from mental retardation. (PSR, § 157). Brian recalls Mr. Heintz as a "bright boy who was funny and happy" and that Mr. Heintz always took care of him. Brian Heintz recalls that, because of his affliction, he was frequently bullied and ridiculed at school and Mr. Heintz would always defend him – yet always managed to find a way to do so without violence.

In 1998 Mr. Heintz' father turned to hard alcohol and quickly became an alcoholic. His father worked a night shift and would always fight with his mother when he returned in the morning. Eventually his father began to physically abuse his brother and him (including punching them) as well. (PSR, § 159). Still, Mr. Heintz loved his father. Then, in 2000, Mr. Heintz' father's alcohol abuse resulted in his death – he passed of Cirrhosis of the liver. (PSR, § 156). Mr. Heintz was 9 years old at the time.

Not only was this emotionally devastating, but it caused tremendous financial hardship for his family. Because of their economic strain, the family

frequently moved and his mother had little time for him and his brother due to her need to work long hours. (PSR, § 160).

According to Mr. Heintz' brother and mother, Mr. Heintz was a good student initially. But when he was in the seventh grade he developed a heart murmur and suffered from digestive issues. With the passing of his father, the onset of an illness, his family's financial strain and constant moving, he began to experience anxiety. (PSR, § 161). He began to miss school, frequently at first and then almost completely. And he started spending time with the "wrong crowd", which led to his drug use. (PSR, § 161).

Mr. Heintz eventually began to recover and was accepted into the Medical Academy at Chatsworth High School and then obtained his high school diploma from City of Angels Independent Studies in Northridge. He began to attend courses at Pierce Community College in Woodland Hills and Pasadena Community College in Pasadena. Unfortunately, however, during this time he and his brother were using drugs.

Mr. Heintz began drinking alcohol early and regularly from age 13 to age 17. By the time he was 16, he was using meth, then heroin, and then fentanyl. Mr. Heintz began to commit property crimes at this time. He was sent to a rehab in Santa Clarita as a result but it did not cure his drug addiction.

b. His Marriage, The Birth of His Daughter, And The Marriage's Demise Due To His Drug Use

At the age of 18 Mr. Heintz met Fatima Ramirez. He and Fatima moved in with her parents. But his drug addiction plagued the relationship and she would

make him leave when she caught him using and would move back home with his mother and brother.

In early 2014 Fatima got pregnant. They had a daughter, Emma Isabella Heintz, on October 21, 2014. Mr. Heintz was sober during this period but within three years he relapsed. Fatima kicked him out for the last time. Now they only speak if it concerns Emma.

Following the end of his marriage, Mr. Heintz drug use was so excessive that he spent two years homeless. His family friend, Mr. Hunt, is much senior to Mr. Heintz and after understanding Mr. Heintz' history, endeavored to be like a father to him. He frustratingly recalls that Mr. Thomas Mr. Heintz told him about is subsequent girlfriend who "had money, was 'hell on wheels', and that they did drugs together. Upon information and belief, this then-girlfriend is a co-defendant in this matter.

c. Mr. Heintz' Ultimate Recovery

For most, being arrested and incarcerated is a traumatic experience. For Mr. Heintz, it changed his life for the better. He was arrested in 2024 and lost access to drugs. And on May 5, 2025, following six months and 10 days of incarceration, he was granted bail to go to rehab and went to the Salvation Army Adult Rehabilitation Center Pasadena. There he thrived. He never relapsed. He got a job in the kitchen. He regained his life skills. He applied and was accepted to college where he just completed his first term with a 4.0 GPA.

And most importantly, he rekindled the relationship between himself and his daughter Emma – who recently visited him at the Rehabilitation Center (where he continues to reside). Mr. Heintz hopes to enter Phase Two of the Salvation

Army program, where he can secure outside employment but still reside there (the undersigned counsel has confirmed that at the Rehabilitation Center he is allowed to be on home detention as a component of Supervised Release. Moreover, the terms of home detention are essentially similar to the terms of the Rehabilitation Center, and he is precluded from social visits or other reasons to leave).

Mr. Heintz believes he has grown tremendously in the drug treatment program. He found religion. He has a sponsor. He is actively working the 12 steps of A.A & N.A. And he now has the support of his mother and brother and is welcomed to live with them when he completes the entire program.

Mr. Heintz story is one of tragedy leading to opportunity. He has faced his demons, overcome them, and actively works to ensure his ongoing sobriety. He is getting the education he was not previously able to complete, and performing exceptionally well. He has the support of his family and a revived and strong connection with his daughter.

Mr. Heintz embodies all of the traits that this Court should want for one previously driven to crime because of a drug addiction. His rehabilitation is nothing less than exceptional.

## VII. WHY THE PROPOSED SENTENCE COMPORTS WITH 18 U.S.C. § 3553(a)

### a. Nature and Circumstances of the Offense

Mr. Heintz's conduct, while serious, was not typical of the core conduct targeted by § 841(a)(1). The evidence establishes small, incremental purchases, limited possession, and an absence of distributable inventory. Even the largest alleged quantity—approximately one ounce—falls below the 40-gram threshold

that triggers a five-year mandatory minimum under 21 U.S.C. § 841(b)(1)(B), a benchmark reflecting distribution-level trafficking. Indeed, the quantity attributed to Mr. Heintz amounts to just 6.25% of that threshold, underscoring how far his conduct falls below the level typically associated with federal distribution offenses.

Mr. Heintz did not operate as a commercial distributor. His conduct stemmed from his addiction and involved acquiring drugs for shared personal use with his then-girlfriend-conduct at the lowest end of the spectrum of § 841 offenses and renders this case distinguishable from the typical federal trafficking one.

b. History and Characteristics of the Defendant

Mr. Heintz's history is marked by prolonged substance abuse beginning in adolescence, coupled with significant personal hardship. But what distinguishes this case is not merely his past—it is his present. He has achieved sustained sobriety, completed a rigorous residential treatment program, complied perfectly with pretrial supervision, and reengaged with education at a high level, earning a 4.0 GPA. He has rebuilt family relationships and established a stable, prosocial path forward. He has achieved exactly what the system hopes defendants will achieve. This is not a case where the Court is asked to speculate about rehabilitation — it has already occurred.

c. The Need for the Sentence Imposed

i. Just punishment and respect for the law

A sentence of time served constitutes meaningful punishment. Mr. Heintz has already spent approximately six months in custody, followed by strict supervision and residential treatment conditions. Further incarceration would add little to the punitive or deterrent value already achieved, particularly given his demonstrated rehabilitation.

ii. Deterrence and protection of the public

Specific deterrence has already been achieved. Mr. Heintz's sobriety, treatment participation, and compliance demonstrate that he is no longer the person who committed this offense. And general deterrence is also satisfied. A federal felony conviction, incarceration and years of supervision send a clear message without requiring additional custodial time.

Moreover, the absence of violence, the addiction-driven nature of his conduct, and his sustained recovery all indicate a low risk of recidivism.

iii. Rehabilitation

This factor weighs heavily in favor of a non-custodial sentence. Mr. Heintz has already done the work that the system hopes incarceration will accomplish — he has addressed his addiction, which was the very root cause of his criminal conduct. Additional incarceration risks disrupting the very progress that makes him unlikely to reoffend.

d. The Advisory Guideline Range Overstates the Necessary Sentence

While the Guidelines provide a starting point, they do not adequately account for the unique facts of this case — particularly the addiction-driven nature of the conduct, the relatively small quantities involved, the circumstances of his conduct in distributing to his then-girlfriend who was also addicted, and Mr. Heintz's extraordinary rehabilitation. The advisory range, driven in part by criminal history and formalistic distribution liability, does not distinguish between addiction-driven sharing conduct and commercial trafficking, and therefore overstates the punishment necessary in this case. This Court's power to issue a downward variance is proper when, as here, the advisory range overstates the seriousness of the offense and offender.

## VIII. CONCLUSION

For the reasons set forth above, Mr. Heintz requests a sentence of time served (6 months and 10 days) followed by three years of supervised release. Should the Court deem additional detained time necessary, he respectfully requests that for a period of six months during his term of supervised release, he is placed on home detention to be served first at the Salvation Army Rehabilitation Center until his program at that facility expires, and if time remains, to complete his detention at home with his mother and brother, with whom he has revived and strengthened his relationships.

Respectfully Submitted,

Date: April 1, 2026 By: LAW OFFICES OF IAN WALLACH, PC

IAN WALLACH
*Attorney for Defendant*,
Mason Edward Heintz